WESTERN CENTER ON LAW AND
POVERTY, INC., Plaintiff,

v.

LEGAL SERVICES CORPORATION,
et al., Defendants.

Civ. A. No. 84–406.

United States District Court,
District of Columbia,

Aug. 13, 1984.

As Amended Oct. 1, 1984.

Max L. Gillam, Irwin Goldbloom, Nancy G. Scheurwater, Latham, Watkins & Hills, Washington, D.C., Mary Burdick, Richard A. Rothschild, Western Center on Law land Poverty, Inc. Los Angeles, Cal., for plaintiff.

Joel P. Bennett, Sherrill R. Spatz, Bennett, Deso, Greenberg & Thomas, Washington, D.C., Richard N. Bagenstos, Legal Services Corp., Washington, D.C., for defendants.

**MEMORANDUM OPINION**

BARRINGTON D. PARKER, District Judge.

The issue in this proceeding concerns the legality of the decision of the defendants, the Legal Services Corporation ("LSC" or "Corporation") and its President, Donald Bogard, to deny refunding to the Western Center on Law and Poverty, Inc. ("Western Center" or "Center"), for fiscal year 1984. In 1983, Western Center received several separate grants from the Corporation, including an annual state support center grant designed to enable the Center to provide specialized legal service to indigent clients. Although all of the plaintiff's 1983 grants from the LSC have been terminated, only the propriety of the termination of the state support center grant is presently at issue.[1]

On June 29, 1984, the Court granted Western Center a preliminary injunction which enjoined the defendants from refusing to pay Western Center the monthly payments on its 1984 state support center grant. The monthly figure of $81,781 was calculated pursuant to the 1984 funding formula enacted by the Congress. Fiscal Year 1984 Appropriations Act for the Departments of Commerce, Justice, State, the Judiciary and Related Agencies, Pub.L. 98–166, 97 Stat. 1071, 1088 (1983) ("Pub.L. 98–166"). The preliminary injunction reversed and set aside an earlier decision of President Bogard denying 1984 funding to Western Center. The Court now turns to the plaintiff's motion for partial summary judgment with respect to the termination decision of the defendants. For the reasons set forth below, the Court determines that the defendants' decision to deny refunding to Western Center was arbitrary and capricious, and grants the plaintiff's motion for partial summary judgment. The reasons supporting the Court's determination are set forth below.

---

**1.** The Corporation also refused to renew the Center's grants for the provision of training and legal research services. These two grants were funded in the amount of $70,000 for 1983, and were not addressed in the administrative proceedings below.

## FACTUAL BACKGROUND

In 1983, the Western Center received an $860,000 state support center grant from the Corporation for the purpose of providing specialized legal services for the benefit of indigent clients. The Center has received similar grants since 1975, when the Corporation came into existence under the Legal Services Corporation Act of 1974 ("Act" or "LSCA"), Pub.L. 93–355, § 1, 88 Stat. 378, codified at 42 U.S.C. § 2996 *et seq.*

On January 4, 1984, the Corporation, through President Bogard, informed Western Center by letter that its activities undertaken in connection with a 1980 ballot initiative known as Proposition 9 were illegal, and that the Center's request for 1984 funding was denied. Ex. 1.[2] Specifically, Bogard's letter to Western Center's Board of Directors, stated that:

> [s]ubstantial evidence has forced us to conclude that [the Center] has violated ... the provisions of Sections 1006(d)(4) [42 U.S.C. § 2996e(d)(4)] and 1007(a)(5) [42 U.S.C. § 2996f(a)(5)] and (6) [42 U.S.C. § 2996f(a)(6)] of the Legal Services Corporation Act and subsequent regulations....

*Id.* at 1. The letter pointed to "significant evidence" that the Center "organized and directed a campaign to defeat Proposition 9, a tax reduction measure on the California ballot in June, 1980." *Id.* Howard Jarvis was the chief proponent of this tax proposal.

It is undisputed that the Center received a $61,000 grant in connection with Proposition 9. These grant funds were expended by June 1980, when Proposition 9 was defeated. Although Bogard's letter does not indicate why the Center's activities related to Proposition 9 were first challenged in January 1984, more than three years after the activities concluded, the exhibits attached to the letter shed some light on the developments which resulted in the termination of funding.

These exhibits include a letter from Lawrence J. Straw, Jr., to the California Attorney General, dated October 10, 1983, Ex. 1–7,[3] and a report prepared by the General Accounting Office ("GAO"), dated September 19, 1983, Ex. 1–1. Straw wrote the letter in his representative capacity as the attorney for Howard Jarvis and the Conservative Caucus. The letter related his clients' belief that the Proposition 9 activities of Western Center, other LSC grantees, and the Corporation were in violation of California state law, and requested a prompt investigation of these charges.

The GAO report was directed to Senator Orrin Hatch, who had recently requested the GAO to investigate the Center's activities and to determine whether it had violated the Act. Ex. 1–1 at 1. The GAO report was prepared hastily and was based exclusively on selected documents which Senator Hatch had obtained from the LSC files. On the basis of these documents, the GAO found that although some of the Center's activities were impermissible under the Act, the Corporation could not recoup the grant funds because it had encouraged the Center's actions. Ex. 1–1 at 16. The GAO also concluded that LSC should promulgate clearer regulations to prevent future improper expenditures.

The Center timely requested a review of President Bogard's January 4, 1984 initial adverse determination. The Corporation

---

**2.** All of the exhibits cited herein are part of the administrative record, filed by the defendants on May 3, 1984.

**3.** The GAO report and the Straw letter are also attached to a November 28, 1983 communication from Thomas J. Opsut, LSC's Director of the Office of Compliance and Review, to Joseph A. Morris, the General Counsel of the Office of Personnel Management. Ex. 2. The LSC letter opined that the Proposition 9 activities of Alan Rader and other Western Center attorneys violated the Hatch Act, 5 U.S.C. § 1501 *et seq.*, and offered LSC services to "cooperate fully in any investigation you deem appropriate." *Id.* On January 26, 1984, an official of the Merit Systems Protection Board responded to the LSC letter, and concluded that "[i]n our opinion, employees of the Legal Services Corporation who participated in the campaign to defeat Proposition 9 did not violate [the Hatch Act]. Ex. 62 at 1.

selected Ralph Drummond, a retired California state judge, to serve as an independent hearing officer. At the hearing, both the Center and the LSC had the opportunity to submit documentary evidence into the record and to present live testimony in support of their respective positions. The Center submitted substantial documentary evidence, including declarations, and presented the testimony of Mary Burdick, the Executive Director of Western Center. Ms. Burdick described the adverse impact of the Corporation's decision on California legal services programs.

For its part, the Corporation rested its case on the documentary evidence and the declarations submitted by the plaintiff. It chose not to cross-examine or depose the Center's declarants, and limited its objections to three declarations submitted by the Center, as Exhibits 18, 45 and 46.

On March 12, 1984, Judge Drummond reversed the initial decision issued by the Corporation. Ex. K (Recommended Decision, Findings of Fact and Conclusions of Law). In reaching this result, he found that the Center's Proposition 9 activities were undertaken on behalf of clients, and that these activities "consisted primarily of gathering information on the potential effects of Proposition 9 and explaining the information to clients and local legal services attorneys." Findings of Fact at ¶ 9. He specifically found that the Center did not express its opposition to Proposition 9, inform people how to vote, engage in voter registration activities, or transport voters to the polls. *Id.*

On April 4, 1984, President Bogard reversed Judge Drummond's decision, and affirmed his own initial decision denying the Center's request for funds. Ex. M, Bogard Decision. Although he did not reject Judge Drummond's factual findings, he drew contrary legal conclusions from those facts. The relevant portions of Bogard's decision are succinctly described below.

First, he concluded that the types of activities conducted by the Center in 1980 violated the Act because they "[were] not required to be performed by attorneys and [did] not involve 'legal advice and representation as an attorney.'" Bogard Decision at 6. These activities were described in a transcript of a videotaped speech given by Alan Rader, a former employee of the Western Center, at a January 1981 meeting of LSC officials in Denver, Colorado. The activities questioned in Bogard's decision in general include: networking with local groups opposed to Proposition 9, hiring coordinators and working with the media to implement this opposition, and providing advice and technical assistance to clients in this connection.

In reaching his conclusion, President Bogard relied principally on the GAO report, as well as his own determination that the Act permits only a "narrow exception" allowing the use of LSC funds to oppose ballot initiatives, to influence the defeat of state initiative petitions, or to conduct voter registration activities. *Id.* at 4, 7.

Bogard also cited a Rader memorandum, dated January 15, 1980, to support his conclusion that the Center's activities did not constitute legal advice and representation. *Id.* at 6. However, the memorandum on its face does not purport to describe activities which were actually undertaken by the Center, Ex. 1-2, and Bogard did not find that these activities were in fact conducted or point to any evidence supporting such a conclusion.

Second, Mr. Bogard rejected the Center's argument that the Corporation approved the Proposition 9 work before it was undertaken. He then suggested that even if LSC officials had approved these activities, this acquiescence would not protect the Center. He severely chastised the LSC officials who approved the grant during the Center administration, and concluded that prior approval by LSC officials

> not only has no legal significance, it has no practical significance since those officials repeatedly failed to enforce statutory restrictions, and in fact ignored those restrictions.

Bogard Decision at 11.

Third, the Bogard decision rejected the Center's contention that LSC's denial of an

$860,000 grant was disproportionate to the offense charged—the use of approximately $61,000 in LSC funds to oppose Proposition 9 on behalf of eligible clients. Although Mr. Bogard indicated "doubt" that the "true measure of the amount of money spent by Western Center and legal services programs in California to defeat Proposition 9 ... can ever be determined," *id.* at 12, he concluded that "over 56,250 hours of L.S.C. paid attorney time may have been diverted" to Proposition 9 activities. *Id.* at 13. This figure was derived from a statement Alan Rader made in his speech at the Denver meeting. In that speech, Mr. Rader stated that the Legal Aid Foundation of Los Angeles released one person from each of its 6 neighborhood offices to devote 75% of his work week to Proposition 9. Based on this lone statement, Bogard estimated that the other 150 legal services offices in the state may have made similar investments in fighting Proposition 9, and thus concluded that 56,250 hours might represent the state-wide legal services efforts. Bogard did not point to any additional evidence to support this speculation.

Lastly, Bogard declined to consider the Center's argument that "California programs and eligible clients would be harmed if [the Center] were denied refunding." *Id.* at 12. He asserted that the "Center's argument has no relevance to the violations charged," *id.*, because the defunding decision was premised on statutory violations, rather than inadequate delivery of legal services. He noted in passing that other California grantees could utilize the available grant funds to provide state support services.

## LEGAL ANALYSIS

The matter presented for the Court's consideration is the propriety of the LSC final administrative decision rendered by President Bogard denying refunding to Western Center. In this connection, the plaintiff filed on May 24, 1984 a motion for partial summary judgment urging reversal of the Bogard decision. Although the defendants oppose the plaintiff's motion,

their position on the appropriateness of summary judgment is somewhat unclear. The defendants concede that the "case is ripe for summary judgment [with respect] to the content of the administrative record and the decision that was made based on that record," Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction and Partial Summary Judgment at 2, filed June 11, 1984, but also caution that "summary judgment is procedurally inappropriate here...." *Id.* at 10.

Despite the defendants' apparent concern, the Court concludes that summary judgment is appropriate. The issue presented is the validity of an administrative decision, and review is limited to the administrative record below. The precise question is whether President Bogard's factual and legal conclusions were reasonable. The resolution of this question does not require the Court to resolve disputed issues of material fact or determine the credibility of the Center's declarants.

Accordingly, the propriety of final LSC administration decisions is appropriately determined without resort to a trial *de novo. Spokane County Legal Services v. Legal Services Corp.,* 614 F.2d 662, 666, 668–670 (9th Cir.1980) (reviewing district court decision at 433 F.Supp. 278 [D.C. Wash.1977] ). *See San Juan Legal Services, Inc. v. Legal Services Corporation,* 655 F.2d 434, 437 (1st Cir.1981).

### A.

### The Appropriate Standard of Review

The Legal Services Corporation is a private nonprofit corporation created by Congress, which has expressly provided that the Corporation is not a department, agency, or instrumentality of the United States government. 42 U.S.C. § 2996d(e)(1). Although the administrative decisions of such entities are not literally subject to the requirements of the Administrative Procedure Act, 5 U.S.C. §§ 701–06, analogous standards have been applied to district court review of LSC decisions. In *Spokane County Legal Services, Inc.,* 614

F.2d at 669, the Court stated that "[i]f there is a rational basis for the [LSC] decision and it is supported by some evidence, the decision should be accepted by the reviewing court."[4] The Court went on to say that the rational basis standard and an "arbitrary and capricious" standard are nearly identical. *Id.* at n. 11 (*citing O'Beirne v. Overholser*, 193 F.Supp. 652, 656 (D.D.C.1961), *rev'd on other grounds*, 302 F.2d 852 (D.C.Cir.1961). *See also Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (equating rationality standard with arbitrary and capricious standard).

■ It is settled law that in determining whether a particular decision is arbitrary and capricious, a court does not abdicate its responsibility to the administrative decision-maker. Instead, the Court should make an inquiry which is "searching and careful" bearing in mind that "[it] is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The United States Supreme Court has recently articulated the factors which suggest that an agency's decision is arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n*, 103 S.Ct. at 2867 (interpreting 5 U.S.C. § 706(2)(A) in rulemaking context). Although the LSC did not engage in rulemaking in this case, comparable factors influ-

ence this Court's review of the Corporation's decision. LSC's action is akin to an agency "order" within the meaning of 5 U.S.C. § 551(6), and both rulemaking and orders are defined as agency action, 5 U.S.C. § 551(13), whose scope of review is governed by 5 U.S.C. § 706(2)(A).

■ In sum, the arbitrary and capricious standard of review is the most appropriate standard for resolution of this case. In determining the amount of deference to be given an agency's ruling, the Court should also consider "the thoroughness, validity and consistency of [the] agency's reasoning." *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) (interpreting agency's construction of statute).[5]

## B.

### Application of the Arbitrary and Capricious Standard of Review to the LSC Decision

Three significant aspects of the LSC decision deserve careful scrutiny under the arbitrary and capricious standard of review. First, and most importantly, President Bogard's ultimate legal conclusion that the activities of Western Center violated the Legal Services Corporation Act is patently unreasonable. Second, even if Mr. Bogard correctly concluded that the Center violated certain provisions of the Act, the sanction of defunding is impermissible under LSC's regulations. Third, the Corporation did not undertake to conciliate its dispute with the Center prior to imposing the drastic sanction of defunding. Each of these aspects of the Bogard decision is central to the result reached by the Corporation, and each is addressed in turn.

#### 1.

#### The Interpretation of the Act

President Bogard concluded that the activities described in the Rader speech vio-

---

4. In a subsequent decision, the First Circuit did not reach this issue because it determined that the Corporation's decision should be affirmed under the less deferential "preponderance of the evidence" standard. *San Juan Legal Services, Inc.*, 655 F.2d at 439.

5. The plaintiff points to a number of factors in support of its conclusion that the Court should pay little deference to the LSC decision. The plaintiff emphasizes that it challenges legal, rather than factual findings, and that LSC has changed its interpretation of the applicable law.

lated the Act, and read into the Act only a "narrow exception" for activities conducted in connection with legal advice and representation. Bogard Decision at 4. He also relied on the GAO report which found that both the Corporation and Western Center had exceeded their authority under the Act.

Three provisions of the Legal Services Corporation Act were invoked by the Corporation as the basis for denying refunding to the Center. The three provisions concern the use of LSC funds to advocate or oppose ballot initiatives, 42 U.S.C. § 2996e(d)(4),[6] to influence the passage or defeat of state initiative petitions, 42 U.S.C. § 2996f(a)(5),[7] or to conduct voter registration activities, 42 U.S.C. § 2996f(a)(6)(C).[8] These statutory enactments govern two types of activities: initiative or legislative advocacy activities, and voter registration activities. The ensuing analysis first discusses the applicable law which is relevant to *both* types of activities, then follows with a discussion of the legislative history which is applicable to each separate activity, and ends with a discussion of the Corporation's own understanding of what constitutes legal advice and representation.

█ With respect to *both* advocacy and voter registration efforts, each statutory provision generally prohibits the employees of grantees from engaging in the specified activity, but each creates exceptions for the

provision of legal advice and representation. The term legal advice and representation is not defined in the Act, nor is it explicitly defined in the regulations promulgated by the Corporation. The regulations, however, provide that "legal assistance activities ... means any activity ... [t]hat, in fact, provides legal advice, or representation to an eligible client." 45 C.F.R. 1608.-2(c).[9] The equation between legal assistance and legal advice and representation provides a starting point for the meaning of legal advice and representation: such activities are provided for the benefit of eligible clients. In addition, the regulation and the statute both show that legal advice and representation includes all activities that lawyers perform on behalf of their clients. This conclusion follows from the absence of a more restrictive language in either the statute or the regulations. Thus, Bogard's conclusion that the exception is a narrow one is unsupported by the statutory language and interpreting regulations.

Furthermore, Bogard did not recite any legislative history to support his interpretation of legal advice and representation activities, and in fact, the legislative history firmly establishes that Congress intended a completely different definition of these activities. The proposed Senate amendment

---

**6.** Section 2996e(d)(4) reads:

Neither the Corporation nor any ecipient shall contribute or make available corporate funds or program personnel or equipment for use in advocating or opposing any ballot measures, initiatives, or referendums. However, an attorney may provide legal advice and representation as an attorney to any eligible client with respect to such client's legal rights.

**7.** Section 2996f(a)(5) provides in relevant part that

no funds made available to recipients by the Corporation shall be used at any time, directly or indirectly, ... to undertake to influence the passage or defeat of ... State proposals by initiative petition, except where

(A) representation by an employee of a recipient for any eligible client is necessary to the provision of legal advice and representation with respect to such client's legal rights and responsibilities ....

**8.** Section 2996f(a)(6) directs the Corporation to:

insure that all attorneys engaged in legal assistance activities supported in whole or in part by the Corporation refrain, while so engaged, from

\* \* \* \* \* \*

(B) any activity to provide voters or prospective voters with transportation to the polls or provide similar assistance in connection with an election (other than legal advice and representation); or

(C) any voter registration activity (other than legal advice and representation);

**9.** The statute provides that legal assistance includes:

the provision of any legal services consistent with the purposes and provisions of this title. 42 U.S.C. § 2996a(5).

to the bill provided that legal assistance is defined as legal advice and representation, and includes:

the *full range and kind of professional services provided by attorneys* as attorneys in non-criminal proceedings or matters *to and on behalf of their clients*, as well as the kind of assistance in education relating to legal rights and responsibilities which lawyers are ordinarily called upon to provide.

S.Rep. No. 495 ("S.Rep."), 93d Cong., 1st Sess. 9 (1973) (emphasis added). This permissive definition is also confirmed by the remarks of one of the Senate floor managers of the bill. 119 Cong.Rec. 40,476, 40,-478 (1973) (Senator Javits). Although the Senate definition of legal assistance was replaced by the House definition, the relevant language regarding legal advice and representation was not repudiated. Conf. Rep. No. 247 ("Conf.Rep."), 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 3897, 3898. Thus, Bogard's conclusion that legal advice and representation should be narrowly construed lacks validity, *see FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. at 37, 102 S.Ct. at 44, and must be rejected.

### Section 2996e(d)(4)

### (Ballot Initiatives)

The legislative history of the specific prohibition in section 2996e(d)(4) against ballot measures reveals that the Senate amendment providing for an exception for legal advice and representation was adopted in conference. Conf.Rep. at 3903. Senator Helms, an ardent opponent of any exception for these activities, stated that the language of this "permissive" amendment would not prohibit "aid to advocacy groups which are substantially involved in organizing or lobbying on issues of public policy." 119 Cong.Rec. 41,072 (1973). While the House version of this bill did not provide an explicit exception for legal advice and representation, it provided for a similar exception for "representations ... in the course of providing legal assistance to eligible clients." H.Rep. No. 247, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. &

Ad.News at 3872, 3879. The House report indicates that the prohibition does not extend to

representations which are on behalf of a client or upon invitation. Program attorneys may not lobby in furtherance of their own personal views. It is fully expected that in the course of representation of clients, legal services attorneys will contact legislators, ... and other members of legislative, quasi-legislative and administrative bodies.

*Id.* In this case, President Bogard did not find that Western Center acted other than on behalf of eligible clients in its ballot initiative activities, and in fact, the record contains uncontradicted evidence that the Center responded to the requests of its clients in the Proposition 9 effort. Under these circumstances, Bogard's conclusion that the Center violated section 2996e(d)(4) is erroneous.

### Section 2996f(a)(5)

### (Initiative Petitions)

With respect to the prohibition in section 2996f(a)(5) against utilizing LSC funds to influence the passage or defeat of state initiative petitions and other legislation, the conference report does not explicitly refer to the exception for legal advice and representation. Conf.Rep. at 3902. This exception, however, was included in the Senate bill, S.Rep. at 15, and included in the final legislation. The validity of this exception was reiterated in the legislative history of more recent technical changes to this provision. H.Rep. No. 310, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad.News 4503, 4513.

The legislative history of this provision in no way limits the scope of legal advice and representation. In fact, Senator McClure urged the Senate to eliminate the exception because it would allow lawyers to: "do what they want to do and when they want to do it." 119 Cong.Rec. 41,082 (1973). He argued that the exception "was written into the bill to give the appearance of a prohibition without the necessity of actually imposing a restraint." *Id.* This legislative history scarcely comports with Bo-

gard's limited view of the nature of legal advice and representation, and mandates that his decision be reversed.

### Section 2996f(a)(6)
### (Voter Registration Activities)

With respect to voter registration activities, Bogard concluded that "[b]y informing groups how to get space for registration activities and how to secure materials [the Center was] not giving legal advice and, therefore, [was] engaged in prohibitory acts under section 1007(a)(6) [42 U.S.C. § 2996f(a)(6)]." Bogard Decision at 7. This narrow reading of the statute is refuted by the discussion concerning legal advice generally, *see supra* at 344, as well as the specific history of the section. Although the House version of the bill, as originally drafted, prohibited all voter registration activities except "representation in civil or administrative proceedings and legal representation in registration cases," Conf.Rep. at 3903, the Senate amendment provided a broader exception for legal advice and representation. The House acceded to the Senate, and the final legislation contains the broader exception. Thus, legal advice and representation must be defined according to the ordinary meaning of the words, and should not be narrowly construed. Bogard's conclusion that the Center violated the prohibition on voter registration activities must therefore be rejected.

### The Corporation's Prior Interpretation

LSC's past administrative formulation of the contours of legal advice and representation also runs directly counter to President Bogard's view of the applicable law. For example, the LSC Board of Directors' Committee on Provision of Legal Services endorsed a report which contained statements that "advice and advocacy may be for problems not initially denominated as 'legal' as legal services responds to needs not addressed elsewhere in the society," Legal Services Corporation, *A Plan For The Future* at 95, attached as Appendix B to Plaintiff's Statement of Points and Authorities in Support of its Motion for Partial Summary Judgment and Preliminary Injunction ("Plaintiff's Motion"), filed May 24, 1984, and that "the Corporation intends the term 'legal service' to be read broadly including all aspects of service necessary fully to respond to the poor." *Id.* at 96.

The Board approved the report at a 1981 meeting, *id.* (Minutes of the meeting of the Legal Services Corporation Board of Directors, March 6, 1981), and the Committee later obtained the Board's approval to give the report "further consideration and additional analysis." Transcript of Board of Directors Conference at 81 (July 17, 1982), attached to Defendants' Motion for Relief From Order, filed August 30, 1984. Although the record does not reflect the Board's final action on *A Plan For The Future*, the statements in the report are consistent with other LSC publications which have given a generous interpretation to the definition of legal services. *See* documents included in Attachment to Amicus Curiae Brief of the Region VIII Project Directors Association, filed May 30, 1984.

These statements suggest that the definition of legal advice and representation in the context of legal services is *at least* as broad as the traditional definition of those functions. Bogard's interpretation of the relevant statutory language is inconsistent with LSC's past construction and requires reversal. *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. at 37, 102 S.Ct. at 44. All of the allegedly objectionable activities performed by the Center are functions which are often performed by private attorneys in the course of their representation of clients, and were thus permissible under the Act.

### 2.

### The Sanction Imposed: Denial of Funding

After the expiration of a grant, the Corporation may refuse to provide financial assistance to a grantee who has violated the Act only if there has been a significant failure by a recipient to comply with a provision of law, or a rule, regulation, guideline or instruction issued by the Corporation.... 45 C.F.R. § 1625.3(b), *as*

*amended,* 48 Fed.Reg. 54200 (Nov. 30, 1983). In this instance, the Center's activities were encouraged and applauded by the Corporation, and thus, these activities cannot constitute a significant failure to comply with the Act.[10]

Bogard was apparently unpersuaded by Judge Drummond's conclusion that the Corporation approved and ratified the Proposition 9 activities. The record, however, conclusively establishes that the Center had the complete support and approval of LSC from the very start. *See* Recommended Decision, Findings of Fact at ¶¶ 10–16; Exs. 1–4 (Grant Proposal, Feb. 20, 1980), 49 (Rader Dec. at ¶¶ 14–20, 31–34); 45 (Celaya Dec. at ¶¶ 5–11); 10 (Draft Proposal, Feb. 8, 1980); 8 (worksheet prepared by LSC San Francisco Regional office); 16 (Kostka Dec. at ¶¶ 3–4) 17 (Lewis Dec. at ¶¶ 6–9). The fact that some of the activities proposed in the draft grant proposal were omitted from the final proposal does not undercut this conclusion. The Corporation was certainly aware of the nature of the activities contemplated in the grant, and LSC approval does not require awareness of every single activity undertaken with the grant funds.

While Bogard relies on the GAO report to support his decision that the Center exceeded the restrictions in the Act, he conveniently ignored the ultimate conclusion of the report: that the Center's activities were authorized by the Corporation, and that under these circumstances, the Corporation could not recoup any funds from the Center.[11] Ex. 1–1 at 16. Since the GAO concluded that the government could not

recoup approximately $60,000 in funds, Bogard's decision to withdraw nearly one million dollars in funds is high-handed, extreme and capricious.

In addition, the Center did not commit a significant violation of the Act because the existing statutes and regulations did not adequately define prohibited activities under the Act. As the GAO report concluded:

> [b]y separate correspondence, we are recommending that the Corporation take appropriate action to amend its regulations governing the activities of fund recipients and Corporation officials in order to prohibit such expenditures in the future.

*Id.* at 16. Under the applicable statutes and regulations, the Center's attorneys could have quite reasonably concluded that their activities fell within the Act's exception for legal advice and representation. *See discussion supra* at 344–346. An examination of the legislative history of the Act would have provided further support for this conclusion. In fact, Alan Rader undertook such an investigation prior to submitting the draft·grant proposal, Ex. 1–1 at 14, and concluded that funds could be legally expended to oppose Proposition 9. Even if Mr. Rader's conclusion was incorrect, the lack of clarity in the existing law and the Center's good faith effort to abide by the law mandate that the Center's violations were not significant.

Lastly, the amount of money spent in connection with the challenged activities could conceivably bear on whether those activities significantly violated the Act. In this case, the record shows that Western

---

**10.** The Center argues that the Corporation's denial of continued funds in the midst of a grant year (January 4, 1984) should be treated as a termination of funding under § 1606.2(a), while LSC maintains that its action should be treated as a denial of refunding under § 1625.2(a)(1). The Court need not resolve this rather academic question because the Corporation has not met the standard justifying denial of funds in either case. (*Compare* 45 C.F.R. § 1606.3(b) (*substantial* failure by a recipient to comply) *with* 45 C.F.R. § 1625.3(b) (*significant* failure by a recipient to comply).) The current version of these regulations became effective on Dec. 30, 1983. *See* 48 Fed.Reg. 54197 (Nov. 30, 1983).

**11.** In fact, the vast majority of the GAO report discusses the Corporation's, not the Center's, violations of the Act. The report limits its discussion of the Center to noncompliance with § 2996e(d)(4), and does not discuss violations of either § 2996f(a)(5) or § 2996f(a)(6). Moreover, it is highly relevant that the GAO report was based solely on selected documents provided by Senator Hatch. The GAO itself disclaimed any belief that the report was definitive, and added that the report was prepared within a "short time frame." *Id.* at 1.

Center received and spent approximately $61,000 in opposing Proposition 9. This expenditure is insignificant when compared to the millions of dollars in funding that the Center has received for support center services.

Bogard's speculations as to the amount of funds spent by other grantees to oppose Proposition 9 are totally irrelevant to the violations charged against the Center, and in any event, these charges are without support. The fact that the Legal Aid Foundation of Los Angeles devoted time and money in Proposition 9 efforts, Ex. 1–3 at 10–11, cited in Bogard Decision at 13, in no way establishes that similar or identical efforts were made by every other legal services program in California. Although Bogard implies that the Center itself spent more than $61,000 in opposing Proposition 9, this implication finds no support in the record. Bogard's leap of logic is apparently based on the fact that Alan Rader attributed the success of the Proposition 9 campaign to staff efforts, leading Bogard to conclude that the "[staff] commitment must have been made [because] Proposition 9 was defeated." *Id.* The fallacy of this logic speaks for itself.

Moreover, the Center's purported violations are even less significant in light of the Center's record of perfect compliance with the Act after the Proposition 9 activities concluded. In the years since 1980, the Corporation has consistently commended the Center's record of exemplary service. Exs. 24–25, 54–55. This praise has been confirmed by numerous legal services organizations, judges, bar leaders, public officials and private attorneys. Ex. 66; Vol. 5, Admin.Record (Declarations and Letters at 1–334). Under these circumstances it is astounding that President Bogard ignored the valuable services rendered by Western Center, and minimized the effect of defunding on legal services programs in California. Bogard Decision at 12. The fact that funds targeted for the Center may "be reprogrammed to other grantees in California and the function of state support would continue," *id.*, does not address the concern that needy clients will suffer from the termination of funds to the Center. Indeed, it is absolutely clear that the provision of legal services would suffer, at least in the short-run, from the demise of the Center. Bogard's failure to consider an important aspect of this issue is unsupportable, and mandates the conclusion that the Bogard decision was arbitrary and capricious. *See Motor Vehicle Manufacturer's Ass'n*, 103 S.Ct. at 2867.

### 3.
### Conciliation

The Corporation first notified the Center of its alleged violations of the Act on January 4, 1984, more than three years after those activities had concluded. Ex. 1. Under its own regulations, the Corporation has a duty to attempt to resolve disputes with grantees prior to taking any negative action. 45 C.F.R. § 1618.5(a) provides that:

> Whenever there is reason to believe that a recipient ... may have violated the Act ... the Corporation shall investigate the matter promptly and attempt to resolve it through informal consultation with the recipient.

Although the Corporation has recently amended a different section of its regulations by removing the requirement of notice and an opportunity to cure violations in most instances, *see* 45 C.F.R. § 1625.3(b), *as amended* at 48 Fed.Reg. 54200 and comments thereto at 54197, the requirement of consultation under section 1618 has not been changed. Even if the obvious incompatibility of these two sections is overlooked, the Corporation's application of revised section 1625.3(b) was itself erroneous.

The comments to section 1625 provide that in certain instances, recipients must be informed that their activities are in violation of the Act, and given the opportunity to correct any violation before the Corporation "[has] a case for establishing a significant violation" of the Act. 48 Fed.Reg. at 54197. The Corporation must take this conciliatory approach in situations in which the violation charged is "minor, technical, or unclear" or "when a recipient in good faith misinterprets a complex, new regulation...." *Id.*

In this case, the Center's violations were certainly minor, given the amount of the Proposition 9 grant, and unclear, given the lack of clarity in the existing law. This same lack of clarity, coupled with the Corporation's prior approval of the Proposition 9 activities, establish that the Center's activities also fit within the exception for good faith misinterpretation of complex, new regulations. *See* 48 Fed.Reg. 54197. While the ballot initiative and voter registration provision were not new in a literal sense, they were new in the sense that they had not been invoked by the Center to deny refunding in any other instance.

Moreover, both the regulation and the statute were difficult to interpret because they provided no guidelines which would enable recipients to avoid prohibited activities under the Act. Some of this confusion has been remedied by the passage of Pub.L. 98–166 in November of 1983. That measure clarified permissible activities in connection with legislative advocacy efforts, *see* 97 Stat. 1089 and the Corporation has implemented these restrictions by publishing a final rule. *See* 49 Fed.Reg. 22651 (May 25, 1984). Obviously, these enactments are not applicable to the Center's 1980 activities, and in fact, provide strong evidence that the Center's activities were not prohibited under the law in existence in 1980.

 Under these circumstances, the Center's request for funds was improperly denied. Instead of attempting to negotiate the dispute or considering options short of a total termination of funds, *see* 45 C.F.R. § 1625.10, *added at* 48 Fed.Reg. 54200 (recipient may be granted refunding "subject to any modification or condition that may appear necessary and appropriate ..."), the Corporation unilaterally denied refunding. This decision is so implausible that it must be considered unreasonable under the applicable law. *See Motor Vehicle Manufacturer's Ass'n*, 103 S.Ct. at 2867.

## CONCLUSION

The statutory language, the legislative history, the LSC regulations, and the Corporation's enmeshment in the Proposition 9 activities establish that LSC's decision to refuse funding to Western Center was arbitrary and capricious. The Court therefore reverses that decision, and requires the Corporation to fund the Center's state support center activities in the amount of its 1983 grant, multiplied by the 14.1 percent increase mandated by Pub.L. 98–166. An appropriate order accompanies this Memorandum Opinion.

## ORDER

In accordance with the Memorandum Opinion entered on this date, it is this 13th day of August, 1984,

## ORDERED

That the plaintiff's motion for partial summary judgment is granted. The defendants shall remit to the plaintiff the grant funds, computed by reference to its 1983 state support center grant and increased by 14.1 percent. These funds shall be remitted forthwith in accordance with the defendants' customary procedures.

That a status conference will be held on August 24, 1984 at 9:00 a.m. to determine the briefing schedule for the outstanding issues in this proceeding.