**NATIONAL CLEARINGHOUSE FOR LEGAL SERVICES, INC., Plaintiff,**

v.

**LEGAL SERVICES CORPORATION, et al., Defendants.**

**Civ. A. No. 86–1800.**

United States District Court, District of Columbia.

Nov. 30, 1987.

Thomas F. Cullen, Jr., Jones, Day, Reavis & Pogue, Washington, D.C., for plaintiff.

Susan Grover, Dunnells, Duvall, Bennett, Porter, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiff National Clearinghouse for Legal Services, Inc. ("Clearinghouse") is a non-profit Illinois corporation in the business of furnishing information services of use to lawyers who represent the poor. Defendant Legal Services Corporation ("LSC") is a non-profit District of Columbia corporation, chartered pursuant to an act of Congress, the Legal Services Corporation Act of 1974, 42 U.S.C. §§ 2996 *et seq.* (the "Act") to administer a federally financed program of grants and contracts in support of organizations providing legal services to the poor.[1] After several years in which Clearinghouse had accepted payments under contracts with LSC to make its services available to LSC's beneficiaries, not all of which it spent in doing so, and had earned substantial additional income from the sale of its services to outsiders

not connected with LSC, Clearinghouse had accumulated a surplus of sufficient magnitude to cause LSC to question the level of support it required from LSC to remain viable. Consequently, LSC tendered Clearinghouse a contract for fiscal 1986 for significantly less money than it had been paid in prior years to perform the same services, with the expectation that Clearinghouse would be obliged to "spend down" its surplus as a condition of a continued LSC subsidy. Clearinghouse objected, and this lawsuit ensued.

In its amended complaint Clearinghouse charges LSC with breach of an implied contract to pay for its services at the former rate, a "misappropriation" of its property, i.e., its lawfully earned surplus, and violation of LSC's own regulations respecting "fund balances" in the hands of its contractors and grantees. The dispute is now before the Court on the parties' cross-motions for summary judgment. Sufficient material facts appear at various places in the record to be without dispute to enable the disposition of the case hereinafter made, and for the following reasons, therefore, the Court will deny plaintiff's motion for summary judgment, grant that of defendant, and dismiss the amended complaint with prejudice.[2]

### I.

Beginning in 1981 LSC and Clearinghouse entered into a series of written annual contracts under which Clearinghouse supplied its services to various LSC-supported legal assistance activities for sums certain for the year, payable in monthly installments. For the period October, 1981, through December, 1982, LSC paid Clearinghouse $950,000. For January through December, 1983, the fee was $760,000; for

---

1. Clearinghouse was formed in 1967. From 1976 through 1981 it operated as a division of LSC, then reverted to independent status from which it contracted annually with LSC to furnish essentially the same services. Clearinghouse publishes a monthly law journal, maintains a brief bank, and provides a computer-assisted research service for poverty lawyers.

2. In conjunction with its original complaint Clearinghouse secured a preliminary injunction

requiring LSC to continue its funding for 1986 at an annualized rate corresponding to a preliminary budget item for its services of $828,423, pending the hearing mandated by statute, 42 U.S.C. § 2996j(2), when LSC proposes to cease financial support of a particular recipient of its funds. *See East Arkansas Legal Services v. Legal Services Corporation,* 742 F.2d 1472 (D.C.Cir. 1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985).

1984, $867,236, and for 1985 $961,851. Each year Clearinghouse spent somewhat less than it was paid by LSC, accumulating a surplus upon which it earned interest. It also earned revenue from sales of subscriptions to its journal to entities not supported by LSC, from duplicating fees charged for copying materials for non-LSC dependents, and from other miscellaneous sources which added to its wealth. At the end of 1985 LSC possessed information to the effect that Clearinghouse held a cash balance in its treasury in excess of $500,000, and it began contemplating a reduction in its level of support for Clearinghouse upon the assumption that it must be paying too much to sustain an organization that was both frugal and partially self-supporting.[3] LSC's staff actually recommended to the Board of Directors that LSC dispense with Clearinghouse's services entirely, but the Board voted on December 19, 1985, to continue funding Clearinghouse temporarily through March 31, 1986, at the 1985 level, and accordingly paid it $240,463 over the succeeding three months.

In early March, 1986, LSC's staff again recommended that the contractual relationship with Clearinghouse be broken off altogether, with its functions thence to be assumed by LSC in-house or in a joint venture with some law school. On March 13, 1986, however, the Audit and Appropriations Committee of LSC's Board of Directors met in anticipation of a plenary Board meeting scheduled for the following day, considered and rejected the staff recommendation, and voted to propose to the Board a $400,000 budget item for a contract with Clearinghouse.[4] On March 14th the full Board met, in public, to consider an agenda which included LSC's entire consolidated operating budget for 1986. (Clearinghouse attended the meeting and was allowed to make a presentation.) As to Clearinghouse's expectancy for the year, debate focused on the "carryover" or "fund balance" then in its possession, estimated to be approximately $550,000, and a consensus developed to pay Clearinghouse at about a $940,000 annual level, with a "Gramm–Rudman" adjustment downwards, against which LSC would take a "credit" for Clearinghouse's $550,000 retained surplus. The Board then voted, nine to two, to budget an additional $200,000 (over and above the $240,463 first quarter payments) for Clearinghouse's services for the remainder of the year. LSC ultimately presented Clearinghouse with a written 1986 contract proposal to that effect which Clearinghouse promptly rejected.

II.

In its original complaint Clearinghouse alleged that LSC had violated Section 1011 of the Act, 42 U.S.C. § 2996j, in suspending or terminating its financial assistance without the hearing the statute requires. It prayed that LSC be enjoined preliminarily from "defunding" it until it had been afforded a hearing. It also asked the Court to declare those portions of its "fund balance," i.e., savings from its payments from LSC accumulated prior to 1984 (when a new "fund balance" regulation became effective and the LSC–Clearinghouse annual contracts modified accordingly), and earnings derived from its sales of services to non-LSC-supported activities, to be immune from any "spend-down" requirements as a condition of future support at the level to which it had become accustomed. Then, the hearing having been held as ordered by preliminary injunction, and the result being adverse to it, Clearinghouse filed an amended complaint advancing its revised claims for relief.

In its motion for summary judgment, however, Clearinghouse presents no evidence at all in support of its theories of an implied contract with LSC for a larger payment for 1986, or a "misappropriation" of

---

3. There is no suggestion made that Clearinghouse had been other than candid and accurate in its accounting to LSC for all of its income and expenditures, or that any of the funds provided by LSC had been misapplied. Nor is there evidence that Clearinghouse's services were deficient in any respect, although some LSC staffers thought them superfluous.

4. LSC's hypothetical budget in support of its request to Congress for its fiscal 1986 appropriation had contained a line item of $865,646 for the Clearinghouse contract.

its funds; indeed, the evidence is to the contrary.[5]

Its remaining claim expresses the principal theory upon which Clearinghouse now relies for relief in its motion for summary judgment. Clearinghouse contends that the action of LSC's Board of Directors in March, 1986, was an attempt to "recapture" funds earlier lawfully paid to and earned by Clearinghouse in contravention of its own regulations imposing limits upon the "fund balances" its contractors and grantees are permitted to carry over from year to year, 45 C.F.R. Part 1628, and in violation of the terms of its earlier annual contracts with Clearinghouse which purportedly expressly exempted surpluses attributable to unspent pre–1984 LSC payments and non-LSC earnings. LSC responds in its cross-motion that the Board's action merely implemented, as the hearing examiner found, a "funding policy" decision permitted to it by 45 C.F.R. Part 1625.

### III.

The hearing was conducted December 16, 1986, by the Hon. Fred Tansill of the U.S. Tax Court, sitting as a hearing examiner. In his decision of December 30, 1986, the hearing examiner found that the Board had adopted a "funding policy" pursuant to 45 C.F.R. § 1625.3(a). He did not reach the Part 1628 "fund balance" issue presented by Clearinghouse.[6] LSC's reviewing official adopted the hearing examiner's decision on January 23, 1987, qualifying it as a final order under 45 C.F.R. § 1625.11. Clearinghouse now seeks review of that decision.

A preliminary question arises as to the standard of review applicable to final LSC decisions. The Act expressly provides that LSC is a private corporation, and not an agency of the United States government, 42 U.S.C. § 2996d(e)(1). LSC's decisions, therefore, are not technically reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (1982).[7] Nevertheless, standards of review analogous to those embodied in the APA have been found to be appropriate in reviewing LSC decisions. *National Clients Council, Inc. v. Legal Services Corporation,* 617 F.Supp. 480, 485 (D.D.C.1985); *Western Center on Law and Poverty, Inc. v. Legal Services Corporation,* 592 F.Supp. 338, 342 (D.D.C.1984). Other federal courts reviewing LSC decisions have employed either a "rational basis," *Spokane County,* 614 F.2d at 669, or an "arbitrary and capricious" standard, *Western Center,* 592 F.Supp. at 342, but the distinction is of little consequence since both tests "ultimately consider the rationality of the underlying decision." *National Clients Council,* 617 F.Supp. at 485.[8]

In reviewing LSC decisions, just as in reviewing administrative decisions under the APA, the reviewing court must bear in

---

5. The record shows LSC to have done nothing to lead Clearinghouse to believe, much less from which the Court could find, that LSC actually agreed to pay Clearinghouse for its services, contrary to the express direction of its Board of Directors. To the extent Clearinghouse rendered services as before of greater value than LSC had offered to pay for them it was a volunteer. And Clearinghouse indisputably retains —or at one time did retain—its surplus (since determined by audit to be $668,155) to spend as it chose. It apparently chose to spend it as LSC wanted it to do.

6. A hearing examiner may not consider any issue not necessary to a determination of whether a recipient's refunding application may be denied. 45 C.F.R. § 1625.7(c)(4). This Court's Order of October 3, 1986, limited the hearing to be accorded Clearinghouse to that required by Part 1625.

7. Notwithstanding the fact that judicial review is not dictated by the APA, review of LSC decisions has been held to be available pursuant to the general federal question jurisdiction found in 28 U.S.C. § 1331 (1976). *Spokane County Legal Services, Inc. v. Legal Services Corporation,* 614 F.2d 662, 666–67; (9th Cir.1980). Moreover, the legislative history reflects a congressional presumption that judicial review would be available. *See* H.R.Rep. No. 310, 95th Cong. 1st Sess. 33, reprinted in 1977 U.S.Code Cong. & Ad.News 4503, 4525–26.

8. *See also Spokane County,* 614 F.2d at 669 n. 11 (no discernible difference between the two tests); *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (equating the arbitrary and capricious standard with a rationality standard).

mind that it is not entitled to substitute its judgment for that of the entity under review. *See Western Center*, 592 F.Supp. at 343, citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Its review of the facts is limited to the record below, and if there is to be found on the record a rational basis for the decision, and it is supported by the evidence, the decision should stand. *See Spokane County*, 614 F.2d at 669; *Western Center*, 592 F.Supp. at 342. The quantum of proof required to establish the facts is, at most, one of "substantial evidence." *E.g., National Clients Council, Inc. v. Legal Services Corporation*, 617 F.Supp. 480, 485 (D.D.C.1985). And in that connection a reviewing court need only determine the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *see also American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 522–23, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1981). Consequently, the limited task of this Court is to ascertain whether there is a rational basis for Judge Tansill's decision and whether the evidence introduced at the hearing supports him.[9]

LSC contends that its decision to decrease its 1986 funding of Clearinghouse represented a "funding policy," promulgated in accordance with 45 C.F.R. § 1625.3(a) which provides, in pertinent part, that "refunding [of a recipient] may be denied" when it will "implement ... a funding policy, standard, or criterion approved by the Board."

Clearinghouse vehemently protests the hearing examiner's characterization of the action as being in the nature of a "funding policy." It was, rather, Clearinghouse

says, a punitive "one-time shot ... targeted directly at Clearinghouse" and designed to confiscate assets LSC could not legitimately reach through its Part 1628 "fund balance" regulations which apply only to post–1983 surplus accumulations and purport to limit permissible year-to-year carryovers of fund balances only with respect to LSC-derived funds. 45 C.F.R. § 1628.1.[10] Clearinghouse perceives LSC's action as an illegal and retroactive application of Part 1628 to its independently derived earnings and its pre–1984 savings from its payments from LSC.

Clearinghouse misapprehends, however, the extent of the discretion conferred upon LSC to distribute its annual appropriation from Congress. One of the Board's principal functions is to set priorities regarding the allocation of the funds it is given each year, and Section 1625.3 provides the Board with the authority to do so, *independent* of Part 1628, in making budgetary decisions which will best serve its constituency and its statutory mission. Its determination to diminish its 1986 support of Clearinghouse was justified, as found by the hearing examiner, by the existence of significant wealth in Clearinghouse's coffers alone, irrespective of the manner of its acquisition, which could sustain it for a time without its former handsome subsidy from LSC. Rationing of the limited public funds it is given by Congress is precisely the kind of policy decision envisioned by Congress for LSC's Board, and LSC's concession that its decision was prompted by an awareness of Clearinghouse's accumulated surplus acknowledges only that the "funding policy" it implemented in March of 1986 under Part 1625 was consistent with the policy behind its "fund balance" regulations of Part 1628, not that it was, in fact, a Part 1628 action. It is no less a

9. The hearing was held pursuant to § 1625.8, at which Clearinghouse had the burden of persuasion to refute LSC's claimed ground for decreased funding by a preponderance of the evidence. 45 C.F.R. § 1625.9. *See also National Client's Council*, 617 F.Supp. at 487.

10. LSC adopted the general "fund balance" regulations, limiting to 10 percent the unexpended amounts of its payments which could be carried

over from year to year, because a number of recipients were beginning to accumulate surpluses, not only Clearinghouse. Excess savings could be recovered by LSC. Although Clearinghouse resisted the application of the regulations to its own situation, it agreed to be subject to the policy they reflected commencing with its FY 1984 contract.

"policy" decision simply because it adversely affected, for the present, but a single candidate for its financial support; precedent-setting decisions often establish general principles even while binding only parties to the dispute. LSC's beneficiaries are now all on notice that it is LSC's policy to discourage the accumulation of wealth by those who continue to look to it for sustenance.

Credible evidence underlies the hearing examiner's conclusion. The minutes of the March 14th meeting and the testimony of Michael Coster, Treasurer and Comptroller of LSC, reflect the Board's overall concern about how to allocate the funds in its control, against a backdrop of competing claims upon them by other deserving supplicants and the robust financial condition of Clearinghouse. Coster testified: "I think the Board decided as a policy what they wanted to do with all of the money that they had for the Corporation, including how much of it they wanted to put into the Clearinghouse line.... [W]e have other things that deal with getting fund balances back and arguing fund balances. We weren't discussing fund balances; we were deciding where does the money that Congress gave us less than five months ago at that point, where is it going to go this year, where is the money going to go?" Coster's testimony was uncontradicted. Indeed, Clearinghouse presented no evidence, as distinguished from argument, to rebut LSC's showing that it understood itself to be adopting a funding policy, much less to carry its own burden of persuading the hearing examiner that it was not.

The minutes reveal no mention by LSC of Part 1628 at the meeting, and express no interest in the sources or the composition of Clearinghouse's surplus. Clearinghouse itself attempted to interject the Part 1628 issue into the debate, and LSC declined at the time to entertain it. LSC was not endeavoring to recover funds it had already paid out; it was making a fiscal judgment as to how funds now in its possession might best be spent.

It is clear that a rational basis existed for the hearing examiner's decision, and that the evidence supports him. The Court concludes that he was correct in finding that the action at the March 14, 1986, Board meeting was the establishment of a funding policy under § 1625.3(a). For the foregoing reasons, therefore, it is, this 27th day of November, 1987,

ORDERED, that defendants' motion for summary judgment is granted; and it is

FURTHER ORDERED, that plaintiff's motion for summary judgment is denied; and it is

FURTHER ORDERED, that plaintiff's amended complaint is dismissed with prejudice; and it is

FURTHER ORDERED, that plaintiff's request for attorneys' fees is dismissed as moot.